IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHAWN MOON, et al.,

Plaintiffs,

v.

THE CINCINNATI INSURANCE COMPANY, et al.,

Defendants.

CIVIL ACTION FILE
NO. 1:12-CV-3112-TWT

ORDER

This action arises from an insurance coverage dispute. It is before the Court on Plaintiffs Shawn Moon and Tanya Moon's Motion for Partial Summary Judgment [Doc. 23] and Defendant The Cincinnati Insurance Company's Cross Motion for Summary Judgment [Doc. 27]. For the reasons set forth below, Plaintiffs Shawn Moon and Tanya Moon's Motion for Partial Summary Judgment [Doc. 23] is GRANTED IN PART and DENIED IN PART and Defendant The Cincinnati Insurance Company's Cross Motion for Summary Judgment [Doc. 27] is GRANTED.

## I. Background

This action stems from the drowning of a two year-old child on March 19, 2009. The decedent drowned in a swimming pool at a home located at 3725 Bradford

Walk Trail, Buford, Georgia (the "Property"). At the time of the accident, the Property was owned by Terry Moon. It was the residence of Shawn and Tanya Moon, the Plaintiffs. Tanya Moon was babysitting several children when the accident occurred. (Compare Statement of Undisputed Material Facts in Supp. of Pls.' Mot. for Partial Summ. J. ¶¶ 1-3 with Def.'s Resp. to Pls.' Statement of Material Facts ¶¶ 1-3).

Terry Moon had an insurance policy through The Cincinnati Insurance Company ("Cincinnati"). The policy covered the Property and included a Lessors Liability Declarations Endorsement. The endorsement includes as an insured "[a]ny person ... while acting as [Terry Moon's] real estate manager."[1] (Compare Statement of Undisputed Material Facts in Supp. of Pls.' Mot. for Partial Summ. J. ¶¶ 4-6 with Def.'s Resp. to Pls.' Statement of Material Facts ¶¶ 4-6).

On June 8, 2009, the decedent's parents and estate filed a lawsuit against the Moons in Gwinnett County State Court. Initially, Cincinnati provided a defense to Shawn and Tanya Moon after having them sign bi-lateral non-waiver agreements. However, on June 9, 2010, Cincinnati denied coverage and stopped defending Shawn and Tanya Moon. The stated reason for denial of coverage was that the policy did not

---

[1] This is the only provision of the Policy mentioned in the Plaintiffs' complaint. (See Compl. ¶ 8). Apparently, it is undisputed that the policy did not provide liability coverage to renters.

cover Shawn and Tanya Moon through their relationship with Terry Moon, the Property owner and policy holder. (Compare Statement of Undisputed Material Facts in Supp. of Pls.' Mot. for Partial Summ. J. ¶¶ 7, 9-11 with Def.'s Resp. to Pls.' Statement of Material Facts ¶¶ 7, 9-11).

The underlying lawsuit resulted in a judgment in favor of the Plaintiffs for $9,850,000 in damages and $956,335.61 in prejudgment interest. Tanya Moon was found to be 50 percent at fault, Shawn Moon 28 percent, and Terry Moon 22 percent. (Compare Statement of Undisputed Material Facts in Supp. of Pls.' Mot. for Partial Summ. J. ¶ 16 with Def.'s Resp. to Pls.' Statement of Material Facts ¶ 16). Plaintiffs Shawn and Tanya Moon filed this action on July 12, 2012, and it was removed to this Court on September 6, 2012. Their complaint asserts claims for (1) bad faith failure to settle under the common law; (2) attorneys' fees under O.C.G.A. § 13-6-11; (3) punitive damages; (4) breach of contract; and (5) bad faith under O.C.G.A. § 33-4-6. (See Compl. ¶¶ 32-44).

The Plaintiffs filed a motion for partial summary judgment on November 8, 2012. The Plaintiffs argue in support of their motion that: (1) Cincinnati waived all coverage defenses other than the coverage defense set forth in its letter denying coverage and refusing to defend; and (2) the allegations in the complaint in the underlying lawsuit indicate there is "arguable" or "potential" coverage that should

have triggered Cincinnati's duty to defend. (See Pls.' Br. in Supp. of Mot. for Partial Summ. J., at 5). The Counterclaim Defendants, Kemi Green and Gbolahan Bankolemoh, join in the Plaintiffs' motion for partial summary judgment and the Plaintiffs' opposition to Cincinnati's motion for summary judgment. (See Counterclaim Defs.' Resp. to Pls.' Mot. for Partial Summ. J., at 1-2).

Cincinnati filed a cross motion for summary judgment on November 29, 2012. Cincinnati contends it properly reserved its rights prior to denying coverage to the Moons and, therefore, did not waive any policy defenses. Cincinnati further argues that it is entitled to summary judgment on the issue of its duty to defend because Tanya and Shawn Moon were not "real estate managers" under the policy and there was no indication in the complaint in the underlying lawsuit that the Moons were acting as "real estate managers" when the accident occurred. (See Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., at 2-3).

## II. Motion for Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59

(1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. Discussion

### A. Whether Cincinnati Waived Grounds for Denial in Its Letter Denying Coverage

The Plaintiffs argue that Cincinnati's letter denying coverage to Tanya and Shawn Moon stated a single reason for denying coverage: that Tanya and Shawn Moon did not qualify as insureds under the policy. The Plaintiffs contend that the Georgia Supreme Court decision in Hoover v. Maxum Indemnity Co., 291 Ga. 402 (2012), requires this Court to rule that Cincinnati therefore waived all grounds for non-coverage not listed in its letter. The Moons argue that Hoover held that when a liability insurer denies coverage and refuses to defend on a stated basis, then the insurer has waived all coverage defenses not stated in the letter denying coverage. Cincinnati argues that Hoover does not apply because Cincinnati first reserved its rights and then later denied coverage and withdrew its defense. Cincinnati further argues that it obtained bi-lateral non-waiver agreements with the Moons that trump

any argument that Cincinnati's rights were not properly reserved in the letter denying coverage.

In Hoover, an employee was seriously injured and filed a complaint against his employer who copied the complaint to the insurer-defendant. The insurer responded by disclaiming coverage and refusing to defend, citing an employer liability exclusion. In the letter denying coverage, the insurer reserved the defense of a lack of timely notice, and included boilerplate language purporting to reserve any other defense that may arise. The court stated that a "reservation of rights is a term of art in insurance vernacular and is designed to allow an insurer to provide a defense to its insured while still preserving the option of litigating and ultimately denying coverage." Hoover, 291 Ga. at 405 (citing National Union Fire Ins. Co. v. American Motorists Ins. Co., 269 Ga. 768, 769 (1998)). The court stated that the purported reservation of rights contained within the denial letter was not a reservation of rights as the term of art is used. The court elaborated that:

> A reservation of rights does not exist so that an insurer who has *denied coverage* may continue to investigate to come up with additional reasons on which the denial could be based if challenged. Rather, a reservation of rights exists to protect both the insurer and the insured by allowing the insurer who is uncertain of its obligations under the policy to undertake a defense while reserving its rights to ultimately deny coverage following its investigation or to file a declaratory judgment action to determine its obligations.

Id. at 406. The court concluded that, "[h]ere, a reservation of rights was unavailable because [the insurer] had already denied coverage outright." Id.

Cincinnati argues Hoover does not apply to its denial of coverage letter because Cincinnati obtained bi-lateral non-waiver agreements with the Moons as the investigation proceeded. Both Shawn Moon and Tanya Moon signed the bi-lateral non-waiver agreements with Cincinnati. (See Tait Aff. Exs. A-D). These agreements specifically state that Cincinnati will:

> [P]roceed to conduct an investigation into all matters surrounding the allegations of the said Complaint and may undertake the defense of [the Plaintiffs] to all allegations of the said Complaint, without prejudice to the rights of the Company, if in fact it has such rights, to later contest any assertion that the insurance coverage provided by the said policies is applicable to the claims made by the [plaintiffs in the underlying lawsuit], to deny liability under the policies with respect to the claims made by the Plaintiffs or to refuse to pay any judgment... it is further understood and agreed that no action taken by the Company ... shall be construed as a waiver by the Company of any terms or conditions of the said policies of insurance or of any rights which the Company may have to deny liability or obligation to [Plaintiffs] under the said policies.

(Tait. Aff. Ex. C). These waivers establish that Cincinnati did not waive grounds upon which to deny coverage when it agreed to defend. See State Farm Fire & Cas. Co. v. Walnut Ave. Partners, LLC, 296 Ga. App. 648, 653 (2009) ("The insurer can avoid estoppel by giving timely notice of its reservation of rights which fairly informs the insured of the insurer's position."). These waivers are equivalent to the reservations of rights discussed in Hoover. See Hoover, 291 Ga. at 405 ("A

reservation of rights is a term of art in insurance vernacular and is designed to allow an insurer to provide a defense to its insured while still preserving the option of litigating and ultimately denying coverage.”).

When Cincinnati subsequently denied coverage and refused to provide a defense, however, its denial letter fell within the purview of Hoover. “When an insurer is presented with notice of a claim and demand for a defense, the proper and safe course of action is to enter upon a defense under a reservation of rights and then proceed to seek a declaratory judgment in its favor.” Hoover, 291 Ga. at 405 (quoting Richmond v. Georgia Farm Bureau Mut. Ins. Co., 140 Ga. App. 215, 217 (1976) (internal quotation marks and alterations omitted)). Here, Cincinnati, like the insurer in Hoover, chose to deny coverage outright as opposed to seeking a declaratory judgment action after filing its reservation of rights. “A reservation of rights is only available to an insurer who undertakes a defense while questions remain about the validity of coverage.” Id. Thus, the reservation of rights was extinguished when Cincinnati denied coverage because a reservation “does not exist so that an insurer who has *denied coverage* may continue to investigate to come up with additional reasons on which the denial could be based.” Id. Accordingly, like the insurer in Hoover, Cincinnati “failed to properly reserve its rights [to assert additional defenses]

when it denied [the insured's] claims on [specific grounds] and refused to undertake a defense." Id.

Accordingly, Cincinnati's letter denying coverage and revoking its defense should be construed as limiting the grounds that Cincinnati can ultimately deny coverage. The letter denying coverage, however, stated broad grounds upon which coverage was denied. The letter stated that the Moons were not "resident relative[s] within the meaning of the Executive Homeowner or Personal Umbrella Liability Policies" and that the Moons' "relationship to [Terry] Moon does not qualify [Shawn or Tanya Moon] as an insured under the Dwelling Policy." (Compl. Ex. C, at 5).[2] Therefore, summary judgment should be granted to the Plaintiffs in this respect and the grounds upon which Cincinnati can ultimately deny coverage are limited to the grounds listed in its letter denying coverage.

B. Whether the Underlying Complaint Triggered Cincinnati's Duty to Defend

[2] The letter denying coverage also included boilerplate language reserving the right to deny coverage "based on any other available policy provision." (Compl. Ex. C., at 5). In Hoover, the court stated that "[t]he boilerplate language in the denial letter purporting to reserve the right to assert a myriad of other defenses at a later date did not clearly put [the insured] on notice of [the insurer's] position." Hoover, 291 Ga. App. at 406. The court held that, "[c]onstrued liberally in favor of the insured," the reservation of rights in the boilerplate language was invalid. Id. Accordingly, the boilerplate reservation of rights contained in Cincinnati's denial letter does not reserve additional grounds for denial beyond those explicitly stated in the letter.

The Plaintiffs argue that Cincinnati violated its duty to defend them in the underlying lawsuit. The Plaintiffs contend the allegations in the complaint in the underlying lawsuit required Cincinnati to continue defending the Plaintiffs. The Defendant contends that the underlying complaint did not implicate coverage and moves for summary judgment in that respect.

"An insurer's duty to defend is determined by comparing the allegations of the complaint with the provisions of the policy." Landmark Am. Ins. Co. v. Khan, 307 Ga. App. 609, 611 (2011) (quoting Pilz v. Monticello Ins. Co., 267 Ga. App. 370, 371 (2004)). The insurer has a duty to defend the action if the allegations "even arguably" implicate insurance coverage. Id. at 612 (quoting BBL-McCarthy v. Baldwin Paving Co., 285 Ga. App. 494, 497-98 (2007)). "Indeed, to excuse the duty to defend the [complaint] must unambiguously exclude coverage under the policy." Id. (quoting BBL-McCarthy, 285 Ga. App. at 497-98).

Here, the underlying complaint states that Terry Moon is the owner of the Property. (See Compl. Ex. 1, ¶ 7). It states that the Property was the "residence" of Shawn and Tanya Moon. (Id. ¶¶ 2, 6, 10). The underlying complaint alleges that the decedent child drowned when left unattended at the Property which was occupied by Shawn and Tanya Moon. (Id. ¶ 2). The complaint further states that Tanya Moon was babysitting several children when the decedent child was left unattended, found

his way to the backyard of the Property where there was an above ground pool surrounded by a deck, where he fell and drowned. (Id. ¶¶ 10-13). The underlying complaint states that the Moons were negligent in "failing to maintain their pool in conformance with local swimming pool codes" and "fail[ing] to keep their premises and approaches safe." (Id. ¶ 14).

The Dwelling Insurance Policy that Cincinnati issued to Terry Moon contains preliminary triggers that the underlying complaint clearly satisfies. The decedent child suffered bodily injury – an occurrence under the Policy – at the insured location, the Property. (See Dwelling Policy, [Doc. 17, at 24], §§ A, E & F). The parties dispute, however, whether Shawn and Tanya Moon are defined as "insureds" under the Policy. The only subdefinition of insured that is capable of implicating coverage for Shawn and Tanya Moon is an insured who is "[a]ny person (other than your employee) or any organization while acting as your real estate manager." (Id., at 23, § D.4).

The Plaintiffs argue that the term "real estate manager" is not defined in the Policy and is, therefore, ambiguous. The Defendant contends that "real estate manager" has an accepted meaning in the industry and is not an ambiguous term. The Defendant states that the underlying complaint in no way implicates the term "real

estate manager" and in particular does not state that the Moons were acting as real estate managers when the accident occurred.

In Sumitomo Marine & Fire Ins. Co. of Am. v. Southern Guar. Ins. Co., 337 F. Supp. 2d 1339, 1358 (N.D. Ga. 2004), the court determined that a general contractor was not a "real estate manager" for the purposes of an insurance policy. The court distinguished Hartford Ins. Co. of the Southeast v. State Farm Fire & Casualty Co., 630 So.2d 652 (Fla. App. 1994), where a construction manager had been held to be a real estate manager. The court noted that the construction manager in Hartford "had a contract to manage and oversee the entire operation, including the sales of homes." Sumitomo, 337 F. Supp. 2d at 1358. The contractor in Sumitomo was different because it "had no role in the day-to-day management of existing homes, had no role in renting or selling homes, and was not involved in the hiring, training and management of sales personnel or the establishment of budgets for operating a venture whose purpose was to sell real estate." Id. The court concluded the contractor was not a real estate manager because it did not "participate in sales, the collection of rents, or other associated duties." Id.

The Plaintiffs argue that the court's discussion of the definition of real estate manager in Sumitomo is impermissible parole evidence that cannot be used to explain any ambiguity in the Policy language. The Plaintiffs contend that, because the

ordinary rules of contract construction apply and because the term is ambiguous, extrinsic evidence is impermissible and the term must be strictly construed in favor of coverage. (See Pls.' Reply in Supp. of Pls.' Mot. for Partial Summ. J., at 7-8). However, there is no indication that the term is ambiguous. See, e.g., Insurance Co. of North America v. Hilton Hotels U.S.A., Inc., 908 F. Supp. 809, 815 (D. Nev. 1995) ("The Court joins several other courts in finding that the term 'real estate manager' is not ambiguous.").

"In construing an insurance contract the test is not what the insurer intended its words to mean, but rather what a reasonable person in the insured's position would understand them to mean." Gulf Ins. Co. v. Mathis, 183 Ga. App. 323, 324 (1987). The question thus becomes whether reasonable persons in the Plaintiffs' position would consider themselves to have been acting as real estate managers when the accident occurred. The more specific question for this motion is whether the allegations in the underlying complaint could arguably implicate the Plaintiffs as real estate managers when they were babysitting the decedent at their residence.

The underlying complaint states that Tanya Moon was babysitting the decedent child at the time of the accident. The Moons do not argue that babysitting is the role of a real estate manager. The underlying complaint also states that the Moons were negligent for failing to properly maintain their pool and failing to keep safe the

premises and approaches. The Moons contend that these tasks are arguably the responsibility of a real estate manager and that there is no reason the Moons could not be real estate managers as well as lessees. The Moons proffer a definition of real estate manager as "one who simply takes care of an owners' needs with regard to a piece of real estate." (See Pls.' Reply in Supp. of Pls.' Mot. for Partial Summ. J. at 11).

The Court concludes that the Moons were not acting as real estate managers. The term "real estate manager" implicates real estate transactions rather than routine maintenance, which usually is the province of an owner or resident. See O.C.G.A. § 51-3-1 ("Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe."). The Court agrees with the analysis in Sumitomo finding that real estate managers are involved in selling or renting houses rather than maintaining and residing in a house. Further, accepting the Plaintiffs' broad definition of real estate manager would completely render meaningless the policy's lack of coverage for tenants of the Property, as the definitions of "insured" avoid any mention of tenants or residents.

Because the unambiguous definition of real estate manager does not engender routine maintenance, and because there is no indication the Moons were acting as real

estate managers – even under their broad definition – when the decedent drowned, the Court concludes that the underlying complaint did not implicate Cincinnati's duty to defend. Accordingly, the Plaintiffs' motion for partial summary judgment should be denied in this respect and the Defendant's motion for summary judgment should be granted.

Cincinnati initially contended that summary judgment in its favor on the duty to defend should lead to the dismissal of all of the Plaintiffs' claims. (See Def.'s Br. in Supp. of Def.'s Cross Mot. for Summ. J., at 9). The Plaintiffs argued in their reply brief that, even if Cincinnati had no duty to defend, it voluntarily undertook duties to the Plaintiffs while controlling the defense and potential settlement of the underlying lawsuit, and those duties continue to support the Plaintiffs' claims, including their claim for bad faith failure to settle. (See Pls.' Reply in Supp. of Pls.' Mot. for Partial Summ. J., at 5). The Defendant did not address this argument in its own reply. Accordingly, although Defendant's cross summary judgment should be granted, the case should not be dismissed.

## IV. Conclusion

For the reasons set forth above, Plaintiffs Shawn Moon and Tanya Moon's Motion for Partial Summary Judgment [Doc. 23] is GRANTED in PART and DENIED in PART and Defendant The Cincinnati Insurance Company's Cross Motion

for Summary Judgment [Doc. 27] is GRANTED. Discovery may proceed on the Plaintiffs' remaining claim.

SO ORDERED, this 25 day of January, 2013.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge